UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KRISTINE R. REDNOUR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-00320-SEB-DKL |
| | ) | |
| WAYNE TOWNSHIP, | ) | |
| WAYNE TOWNSHIP FIRE DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON PENDING MOTIONS

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket No. 38], filed on February 21, 2014 pursuant to Federal Rule of Civil Procedure 56(a); Plaintiff's Motion for Leave to File Surreply [Docket No. 91], filed on July 21, 2014; and Defendants' Motion for Leave to File Sur-Surreply [Docket No. 99], filed on September 15, 2014. For the reasons set forth below, Plaintiff's Motion for Leave to File Surreply is GRANTED in part and DENIED in part, Defendants' Motion for Leave to File Sur-Surreply is GRANTED, and Defendants' Motion for Summary Judgment is DENIED.

## Facts

Plaintiff Kristine Rednour was employed by Defendant Wayne Township Fire Department (WTFD) as a paramedic from 2009 to 2011. She began her employment with WTFD in February 2009 as a reserve paramedic; in June 2009, she became a full time civilian paramedic. Rednour Dep. 45.

The Wayne Township Fire Department is a municipal entity providing fire protection and emergency services for the residents of Wayne Township, Marion County, Indiana. WTFD

operates five firehouses in Wayne Township; each shift at each firehouse is staffed by two paramedics or emergency medical technicians (EMTs). Scott Dep. 149. These two emergency service providers typically operate as a team, with one driving an ambulance and the other administering patient care en route to a hospital. At the time when the events giving rise to this suit took place, Gene Konzen was the Fire Chief for Wayne Township and the head of WTFD. Konzen Dep. 33. Richard Scott was the Deputy Chief of Administration, whose responsibilities included the hiring and firing of employees and the administration of WTFD's rules, regulations, and policies. Scott Dep. 82–83, 129. Justin Sparks was the Division Chief of Emergency Medical Services, responsible for the supervision of WTFD's EMTs and paramedics. Sparks Dep. 49. Rednour's immediate supervisor at the firehouse was Lieutenant Felicity Morgan. Morgan Dep. 18. WTFD's written job description for a paramedic includes the following "essential functions and abilities":

- "[A]bility to exercise judgment in unique and ever-changing environments, make quick, appropriate and rational decisions, perfo[rm][1] complex tasks, remain calm, and bring order to stressful situations," Konzen Aff., Ex. 1 at ¶ 4.1.5;

- "Ability to assess the medical needs of and provide care to patients, to carry patients and equipment under a wide variety of difficult circumstances, drive an emergency vehicle under all conditions, and record and accurately relay information by telephone, radio, in writing, and in person," *id.* at ¶ 4.1.7;

- "Ability to follow complex verbal and written instructions and confo[rm] to established practices, protocols, and policies," *id.* at ¶ 4.1.8;

---

[1] The version of the written job description designated as evidence, Konzen Aff. Ex. 1, contains a consistent rendering error in which "rm" letter combinations appear as the letter "m."

- "Good oral and written communications skills with the ability to read technical info[rm]ation and accurately assimilate and use such info[rm]ation," *id.* at ¶ 4.1.9;

- "Monitor[] patient while in transport and continue[] treatment as indicated; provide feedback as authorized to other involved personnel regarding outcome of [ambulance] run," *id.* at ¶ 4.6; and

- "Ability to safely and effectively operate emergency and non-emergency vehicles under all conditions." *Id.* at ¶ 4.7.1.

The WTFD Standard Operating Guidelines also provide that paramedics must be "in the vehicle and responding within one (1) minute of dispatch," and should arrive on the scene within 10 minutes for all emergency calls meeting urgency criteria. Konzen Aff., Ex. 2.

Rednour has type 1 diabetes, which was diagnosed when she was 12 years old. Rednour Dep. 50. She treats her diabetes with an insulin pump, and she monitors her blood sugar some 6-10 times per day. *Id.* at 55. For type 1 diabetics, the regular administration of insulin doses prevents life-threatening high blood sugar levels, but can in turn lead to hypoglycemia—an abnormally low blood sugar level that can impair cognitive and bodily functioning when it reaches certain thresholds.[2] Endocrinologist Samuel Wentworth, M.D. has treated Rednour's diabetes for more than twenty years. Because of Rednour's concerns about the long-term effects of high blood sugar on her health, Wentworth explains that Rednour "tends to run her blood sugars as close to physiological as possible," which creates a "tendency to have low blood

---

[2] According to Dr. Steven Moffatt, medical consultant for WTFD, diabetics whose blood sugar levels drop below 70 mg/dL may experience "symptomatic hypoglycemia." Moffatt Dep. 99. "[M]y experience has shown that episodes of hypoglycemia in the 30 [mg/dL] to 40 [mg/dL] range or even in the high 40s can sometimes lead to unconsciousness." *Id.* Further, Moffatt opined that a blood sugar level below 30 mg/dL "becomes a metabolic problem to where . . . patients can oftentimes die, have cardiac arrhythmias." *Id.*

sugar." Wentworth Dep. 39. *See also* Rednour Dep. 63. Rednour testifies that she begins to experience some initial physical symptoms when her blood sugar drops below 70 mg/dL: "When I can't communicate or I start yawning . . . I check my sugar, and that's usually right below 70 . . . my yawning will start at 74 and below." Rednour Dep. 63. Rednour made WTFD aware of her diabetes at the time of her initial hiring; Dr. Steven Moffatt, the physician who performed Rednour's initial fitness-for-duty examination on behalf of WTFD, knew about her diabetes when examining her for hiring as a paramedic in 2009. Moffatt Dep. 47–48.

While working as a paramedic for WTFD, Rednour experienced four episodes of low blood sugar while on the job. Rednour Dep. 133. The first incident occurred in 2009, when she was still working as a reserve paramedic; while driving a patient to the hospital, Rednour missed an exit off the highway. Rednour Dep. 122. Her team partner, EMT Kelly Jacobia, asked Rednour to stop the ambulance so that Jacobia could drive the rest of the way to the hospital. Rednour addressed her low blood sugar by drinking fruit juice, and she reported the incident to her firehouse supervisor. *Id.* The second incident, according to Rednour, occurred sometime in 2010, after she had become a full time paramedic. While her ambulance team was on stand-by at the site of a SWAT team raid, members of the fire engine crew noticed behavioral changes in Rednour, telling her that she "was not acting [her] correct self." *Id.* at 117–118. Rednour does not remember feeling symptoms of low blood sugar during that incident, nor did she check her blood sugar at the time; she did, however, drink a soda at her co-workers' suggestion. *Id.* at 118.

**The 2011 incidents**

Two later low blood sugar incidents, both occurring in 2011, were more serious. On the night of January 26, 2011, Rednour was driving an ambulance in response to an emergency call when her partner, Jamie Barry, asked her to pull over, telling her that she had not been following

4

behind the fire engine as is customary on emergency runs. Rednour Dep. 108. According to

Barry, Rednour mistook the flashing lights from her own ambulance for those of the fire engine

and disregarded his instructions regarding the steering of the ambulance. Barry reports that

Rednour continued to steer the vehicle erratically, until:

> We came to another traffic control signal, and at that point she finally stopped the
> vehicle, but she stopped the vehicle because two IMPD police cars had pulled up
> in front of us. I got the vehicle put into park, turned off the ignition, and got her to
> go around to the back of the vehicle to check her blood sugar. And we checked
> her blood sugar, and it was found to be low.

Barry Dep. 94–95. Barry reported the incident to the firehouse, which dispatched a second

ambulance to the scene of the emergency. *Id.* at 96. WTFD's written incident report noted that

Rednour's blood sugar was at 23 mg/dL when tested, and that she was able to restore her normal

cognitive function by drinking a soda stored in the ambulance. Barry Dep., Ex. 10. After the

incident, Rednour had a discussion with Barry about how to prevent future low blood sugar

problems; Rednour stated that she would thereafter let Barry drive at night (when her vision

problems tended to be worse), she would test her blood sugar before embarking on emergency

runs, and she would keep a soda on hand at all times to combat a hypoglycemic episode.

Rednour Dep. 112, 116.[3] In Rednour's words, she told her co-workers that "I was sorry that it

happened, and I would do everything within my power to stop it from happening again. And that

was it." *Id.* at 113. Rednour reported the results of her discussion with Barry, and the steps she

planned to take to prevent future episodes, to her immediate supervisor, Felicity Morgan.

---

[3] In her deposition, Rednour expressed uncertainty about when she had started making sure that
she had a "coke" on hand on emergency runs. She recounted, however, that she had started
"doubly making sure" to do so after the January 2011 incident. Rednour Dep. 116.

Morgan Dep. 48; Rednour Dep. 112, 116.[4] Morgan recounts that she, Morgan, then spoke of the situation with her battalion chief, Jerry McWhirter. *Id.*

The final incident took place on June 22, 2011. When Rednour and Barry received a call for an ambulance run, Rednour had tested her blood sugar within "a half hour to an hour"; relying on the normal results of this test, Rednour elected not to test her blood sugar immediately before embarking in the ambulance. Rednour Dep. 88–89. She drove the ambulance to the source of the emergency call—the home of a patient suffering emesis and other stomach distress. During the 20 to 30 minute drive from the patient's home to St. Vincent Hospital, the two partners switched roles, and Rednour sat in the back of the ambulance to provide patient care during the ride. Barry Dep. 99. While she was preparing to administer an IV, Rednour began to feel that something was "off" due to dropping blood sugar, and she never set up the IV out of concern that she would be unable to perform the task properly. Rednour Dep. 75. There was a soda in the ambulance, but it had been stored in the front driver's area; Rednour therefore did not take action to correct her low blood sugar during the drive to the hospital. When the ambulance arrived there, Barry opened the rear doors to find that the patient's IV had never been set up. Barry described Rednour as appearing disoriented, which he took to mean that her functioning was again impaired by low blood sugar, and he advised her to drink a soda to inject sugar into her system. Barry Dep. 100.[5]

_____

[4] WTFD's position statement submitted as part of their defense of Plaintiff's EEOC claim, Pl.'s Ex. 10, described these proposed changes as an "accommodation." Pl.'s Ex. 10 at 5.
[5] Barry recounted the encounter he had with Rednour as he opened the ambulance doors as follows:

> I opened the back of the ambulance. She was sitting near the back doors of the ambulance, as close as she could. Looked a little bit flush [sic]. I don't remember if she was sweaty or diaphoretic, but she didn't look her normal self. She may have looked a little bit bothered when we started the transport, which I

When Rednour and Barry delivered the patient to the triage nurse at St. Vincent and attempted to provide an oral report of the patient's condition, Rednour recounts that she "started talking, and . . . could not converse like I normally would converse. That's when Jamie [Barry] asked them to get a glucometer, and someone brought me orange juice." Rednour Dep. 81. After the patient had been delivered and Rednour had drunk a glass of orange juice, Barry measured Rednour's blood sugar at 26 mg/dL. Barry Dep. 103; Barry Dep., Ex. 32. Before Barry and Rednour returned to the firehouse, Rednour apologized to the patient for "possibly being spacey." Rednour Dep. 65. On the drive back to the firehouse, Barry informed Rednour that he no longer wanted to work as her partner. Barry Dep. 103.

During the nine-month period from September 2010 to June 2011 in which these two incidents occurred, Rednour had no appointments with her endocrinologist Dr. Wentworth. Wentworth Dep. 36. According to Wentworth, this "gap" resulted from a missed appointment by Rednour; over the course of his years of treating her, it has been typical for her to visit his office for a check-up approximately every three months. *Id.* at 32, 35. The first time that Wentworth examined Rednour after the two incidents was on July 29, 2011. His examination report, like some previous reports, placed her diabetes in the category of "Type 1 – Uncontrolled." Wentworth Dep., Ex. 2. As Wentworth later explained, however, a patient's diabetes is technically classified as "uncontrolled" when his or her "A1c" score[6] reaches a certain level;

---

attributed to the patient's vomiting, which would not have been out of character for her at that point.

    Miss Rednour said to me that, oh, we're here already . . . implying she was surprised that we had already been at the hospital. My suspicions were at that point that her blood sugar was low.

Barry Dep. 100–101.

[6] A1c is a measure of the level of glucose attached to hemoglobin molecules in a patient's bloodstream; its measurements are thus on a different scale than those quoted in milligrams of glucose per deciliter of blood. According to Dr. Wentworth, nationwide standards set by the

Wentworth himself found Rednour to be "compliant" with medications and clarified that he would not describe her diabetes as uncontrolled in the everyday sense of the term. Wentworth Dep. 100–103. He noted Rednour's tendency to have low blood sugar at mid-day and "hypoglycemic episodes occasionally at night, more often in the afternoon." Wentworth Dep., Ex. 2.

**Results of the June 2011 incident**

Both Barry and Rednour informed Lieutenant Felicity Morgan, their supervisor, what had happened on their June 22, 2011 ambulance run. Morgan Dep. 53. Morgan, in turn, reported the incident to Deputy Fire Chief Richard Scott, who was responsible for WTFD's personnel matters. Scott ordered both Morgan and Barry to file written reports, and he sent Rednour home for the rest of the day on June 22.[7] Morgan Dep. 24; Rednour Dep. 66. WTFD asked its consultant physician, Dr. Steven Moffatt, to perform a "fitness for duty" examination on Rednour in the wake of the incident. Moffatt Dep. 21. After an examination and a phone consultation with Rednour's treating endocrinologist, Dr. Samuel Wentworth, Moffatt stated in his written report as follows:

> Kristine [Rednour] is status post hypoglycemic episode. I discussed the situation with her endocrinologist who relates that based on her prior episode at Clarian[8] she responded very well to an adjustment in her basal dose of insulin to be adjusted before beginning her shift. She is aware that being hypoglycemic and having to require assistance from fellow employees is not an acceptable solution for accommodation. I have discussed the situation with Dr. Wentworth who feels

---

American Diabetes Association treat a score of 7.0—which was Rednour's score on July 29, 2011—as the dividing line between controlled and uncontrolled. Wentworth Dep. 23–24.
[7] Barry's letter to WTFD management described his sense that working with Rednour had become unsafe. He stated, in part: "Each one of the three hypoglycemic episodes that have occurred while I have been with [Rednour] while on EMS runs has increased my concern for my well being and safety as well as [Rednour's] ability to provide safe and competent patient care." Pl.'s Ex. 10 at 22 (Barry letter).
[8] This refers to a low blood sugar episode that Rednour had in her previous employment with Clarian Health (now IU Health).

confident that adjustment in her basal dose will solve this particular issue based on prior events at Clarian. However, I do recognize the situation with regard to two episodes on-duty and hypoglycemia requiring assistance from a fellow employee. **It could be a reasonable accommodation to allow for a more significant timeframe to determine whether or not she has responded to the adjustment in the basal dose insulin and no further episodes of hypoglycemia. The approach may be restrictive duty for a length of time of approximately 2-4 weeks with no episodes of hypoglycemia and a return to duty after the determined timeframe** . . . . I will say that she has a long history of being compliant with her medications; however she does understand the severity of this particular problem associated with her diabetes. She may return to limited duty status with no driving departmental vehicles until such time as the 2-4 week interval has been achieved with no further episodes of hypoglycemia requiring supplementation.

Moffatt Dep., Ex. 6 at 1–2 (emphasis added).

After Moffatt submitted this report on July 7, 2011, Deputy Chief Scott consulted with Moffatt on the phone and collected the accounts of Barry and Lt. Morgan. In his phone conversation with Dr. Moffatt, Scott inquired whether Moffatt could "guarantee" that, if his recommendations for a trial light-duty period were implemented, there would be no other low blood sugar incidents after Rednour returned to full duty. Scott Dep. 224. Dr. Moffatt responded that he could not offer any such guarantee. *Id.* Scott elected not to credit Moffatt's suggested solution, explaining to Moffatt that "we don't have light duty for that particular event."[9] *Id.* Also on July 7, Sparks forwarded to Scott a communication from Dr. Daniel O'Donnell, an Indiana University physician who served as WTFD's EMS medical director. Sparks Dep. 114. O'Donnell had never examined Rednour, and in the report that Sparks forwarded to Scott, O'Donnell deferred to Dr. Moffatt on the question of Rednour's termination or retention; in his words, Dr. Moffatt "was really the one[] to address this providers [sic] medical conditions as

---

[9] Scott's deposition testimony does not explain what he meant by this statement; it is unclear whether he told Moffatt that WTFD had a policy against light duty for paramedics, or rather light duty specifically to accommodate diabetic employees.

they relate to being fit for duty." Pl.'s Ex. 13 (email from Sparks to Scott); Sparks Dep. at 114–

120. Scott also performed some independent internet research on type 1 diabetes, Scott Dep.

271–275. Based on the employee reports, his phone conversation with Dr. Moffatt, and his own

internet inquiries, Scott then suggested to WTFD Fire Chief Konzen that Rednour be terminated.

Konzen Dep. 51.[10] After consulting with Scott and Sparks and reviewing the written material

submitted by Barry, Morgan, and Dr. Moffatt, Konzen made the final decision to terminate

Rednour's employment with WTFD. *Id.* at 47.

    Deputy Chief Scott met with Rednour on July 12, 2011 and informed her that WTFD had

decided to terminate her employment. According to Rednour, Scott told her that the Department

was letting her go because of her diabetic status and because the Department's insurance would

not cover her condition. *See* Pl.'s Ex. 14; Scott Dep. 270 (citing Pl.'s Ex. 29). Two weeks later,

Scott sent Rednour an official "separation of service" letter, which explained the basis of her

termination as follows:

> Your separation of employment is due to unsolicited discovery of medical events
> caused from your diabetes. The events were on duty, having a direct threat to you,
> your partner, assisting crews, patient care, and safety of the general public. Under
> ADA Title II, it is the Wayne Township Fire Department's position not to cause
> undue financial and administrative burdens on other employees', or the
> community. By doing so it would fundamentally alter the nature of our service,
> program, and activity's [sic] being provided.

Pl.'s Ex. 15. Rednour's official termination date was August 3, 2011. *Id.*

---

[10] Konzen quotes Scott as saying, in effect, "Now that you've delegated the fact gathering and
the analysis to me, here's my recommendation." Konzen Dep. 51. (The context of Konzen's
testimony makes clear that he intended this as a paraphrase of Scott's attitude rather than a direct
quote.). Konzen confirmed that Scott did, indeed, have discretion to make initial
recommendations with respect to terminating an employee within WTFD's management
structure. *Id.*

Rednour filed a timely discrimination complaint with the Equal Employment Opportunity Commission (EEOC) on November 11, 2011. Compl. ¶ 3. The EEOC denied her claim on November 28, 2012, and she filed this civil complaint in timely fashion.

## Motion for Leave to File Sur-reply

On July 21, 2014, Plaintiff filed her Motion for Leave to File Surreply [Docket No. 91]. Southern District of Indiana Local Rule 56-1(d) governs the permissibility of surreply briefs in this district. It provides that "[a] party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." S.D. Ind. L.R. 56-1(d).

Here, Plaintiff contends that she is entitled to file a surreply because Defendants in their reply have cited new evidence, objected to the admissibility of the evidence cited in Plaintiff's response in two respects, and advanced "new arguments." Docket No. 91 at 2.[11] Specifically, Plaintiff contends that Defendants' reply cited a small portion of Kristine Rednour's deposition—page 99—that had not been cited before. Docket No. 97 at 3. She also points to two objections Defendants raised to the admissibility of certain articles designated by Plaintiff in her response (Docket Nos. 54-29, 54-30, 54-35) as well as her designation of the expert report of Dr. Charles Clark, Pl.'s Ex. 28. Finally, Plaintiff argues that Defendants raised numerous new

---

[11] In support of the notion that a surreply should be allowed to respond to new arguments raised in a reply—a proposition not directly supported by the text of Local Rule 56-1(d), Plaintiff cites *Meraz-Camacho v. United States,* 417 F. App'x 558, 559 (7th Cir. 2011) (holding that a surreply "should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief"), and this court's decision in *Heckler & Koch, Inc. v. German Sport Guns GmbH,* 2013 U.S. Dist. LEXIS 76580, at *7 (S.D. Ind. May 31, 2013) ("The purpose of a surreply is to address new matters argued in a reply brief."). Because we conclude that the "new" arguments that Plaintiff points to in Defendants' reply brief are either not new or relate to objections to the admissibility of Plaintiff's response evidence (as with Rednour's declaration), we do not need to address the question of a broader reading of the Local Rule.

arguments in reply to which she is entitled to respond: that Plaintiff's proposed accommodation does not qualify as an accommodation, that Rednour's declaration contradicts her earlier deposition testimony, that Rednour inappropriately testifies to medical causation, that Rednour mischaracterizes her doctor's visits, and that Plaintiff has misrepresented the status of pre-2009 ADA case law. Docket No. 91 at 2–3.

We address first the claim that Defendants' reply cited new evidence and objected to the admissibility of the evidence cited in Plaintiff's response brief. In their reply, Defendants submitted seven pages of Kristine Rednour's deposition that had not been designated in their motion for summary judgment. *See* Docket No. 39, Ex. G; Docket No. 72, Ex. J. Although some of this new section of the deposition had been cited by Plaintiff in her response, Defendants cited page 99 in their reply—the first time either party had done so. Defendants cited this portion of the testimony primarily to call into question Plaintiff's diligence in seeking treatment. *See* Defs.' Reply at 15–16. We agree with Plaintiff that this is "new evidence" in the reply. *See Celadon Trucking Servs. v. Sherwin-Williams Co.*, 2004 U.S. Dist. LEXIS 25836, at *4–5 (S.D. Ind. July 22, 2004) (allowing a surreply where a party in reply relies on "evidence not previously cited" and considering "additional deposition designations" to be new evidence). Defendants concede that their reply raised objections to the admissibility of three articles designated by Plaintiff, and to the admissibility of the report submitted by Plaintiff's expert, Dr. Clark. Defendants accordingly concede that Plaintiff should be allowed to rebut those objections in a surreply. Docket No. 95 at 2 ("Defendants have clearly stated . . . that they do not object to Plaintiff's efforts to file a Surreply to respond to Defendants' argument regarding the admissibility of the evidence cited in Plaintiff's Response.").

With respect to the new arguments Plaintiff insists Defendants raised in their reply brief, we agree with Defendants that a number of these points were not "new," but rather were attempts to rebut Plaintiff's responses to their initial motion. The following portions of Defendants' reply were either continuations of arguments made in the initial motion or retorts to Plaintiff's response: the argument that "Rednour attempted to minimize her handling of her low blood sugar episode," *see* Docket No. 39 at 21, Docket No. 70 at 3; that "Rednour acknowledged she would have been unable to perform the IV stick without it being compromised," Docket No. 39 at 21; that Plaintiff "mischaracterized the status of pre-2009 ADA case law"; and that "no reasonable accommodation existed" for Plaintiff's disability, *See* Docket No. 39 at 2, 17. Surreplies "must be limited to the new evidence and objections." S.D. Ind. L.R. 56-1(d). The portions of Plaintiff's proposed surreply addressing these issues should therefore be stricken.

We conclude, however, that there is an additional issue on which Plaintiff should be allowed to submit a surreply. On two occasions in their reply brief, Defendants invoke the "sham affidavit" rule, insisting that Rednour's declaration in opposition to summary judgment contradicts her deposition and should be disregarded to the extent of the contradiction. Defs.' Reply 6, 9 (citing *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–1169 (7th Cir. 1996)). Though neither party characterizes these portions of Defendants' reply precisely as such, we conclude that, in substance, they amount to a request that we strike at least portions of the Rednour Declaration, Pl.'s Ex. 22. Because this too is an objection "to the admissibility of the evidence cited in the response," Plaintiff will be permitted to address this portion of the reply brief in her surreply.

With these considerations in mind, we GRANT Plaintiff's motion for leave to file surreply in part and DENY it in part. Accordingly, we shall consider the portions of Plaintiff's

attached surreply that relate to the new evidence designated by Defendants or relate to Defendants' challenges to the admissibility of Plaintiff's designated articles, the expert report of Dr. Clark, and Rednour's declaration. These include the following sections of Plaintiff's surreply: Section II.C.1 (pages 4–6, relating to the accommodation proposed by Dr. Clark),[12] Section II.D (pages 7–9, relating to Rednour's declaration), Section II.F.1 (pages 12–13, relating to the three articles cited by Plaintiff in opposition to summary judgment), and Section II.G (pages 15–16, relating to Dr. Clark's expert report). Plaintiff's surreply [Docket No. 91, Ex. C] is deemed filed as of July 21, 2014, but those portions not enumerated above are stricken and will not be considered in resolving Defendants' motion for summary judgment.[13]

## Defendants' Motion to File Sur-Surreply

On September 15, 2014, Defendants filed a motion for leave to file a response to Plaintiff's surreply—or a "sur-surreply," for lack of a more elegant term. *See* Docket No. 99. The proposed brief, which they attached to the motion, primarily concerns the testimony of Rednour's gynecologist, Dr. James Brillhart, which Defendants assert contradicts a portion of Rednour's account of the cause of her low blood sugar episodes in 2011. *Id.* The Court had

---

[12] This portion of the surreply addresses Dr. Clark's proposed accommodation of a continuous blood glucose monitor, which Plaintiff included in its response brief and Defendants addressed for the first time in their reply.

[13] Plaintiff has also designated five additional pieces of evidence in conjunction with the surreply motion; all are declarations dated July 21, 2014. One of them, Dr. Clark's supplemental declaration, Pl.'s Ex. 41, directly addresses Plaintiff's arguments concerning his qualifications to speak as an expert witness and is thus admissible; Defendants do not suggest otherwise. *See* Docket No. 95 at 6 (asserting that Dr. Wentworth's supplemental declaration and Rednour's supplemental declaration—but not Clark's—"do not relate to the admissibility of evidence" and thus should not be considered). Another of the attached declarations, Rednour's supplemental declaration, is subsequently cited by Defendants in their sur-surreply. *See* Docket No. 99 at 3. We therefore conclude that no prejudice would result from our consideration of the Rednour supplemental declaration. We do not find any of these other supplemental declarations to be relevant to our resolution of the material issues raised by Defendants' motion for summary judgment.

earlier ruled that Plaintiff had failed to identify Dr. Brillhart in response to Defendants' interrogatories in discovery, and therefore allowed Defendants an enlargement of case deadlines to depose Dr. Brillhart. *Id.* at ¶¶ 8–10. The Court further stated: "Consideration of Defendants' motion for summary judgment is STAYED until September 15, 2014, at which time Defendants may move for leave to file a surreply based on Dr. Brillhart's deposition and medical records." *Id.* at ¶ 11 (citing Docket No. 85).

We GRANT Defendants' motion and deem the attached sur-surreply filed as of the date of the motion. Though we consider the argument presented in the sur-surreply with respect to Dr. Brillhart, we do not consider the factual dispute to which it relates as material to our resolution of the underlying motion for summary judgment, which we address below.

### Motion for Summary Judgment

### Standard of Review

The Federal Rules of Civil Procedure provide that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some

alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

## Discussion

### I.    Legal Standard

Plaintiff's claim against her former employer WTFD arises under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, which provides safeguards for disabled individuals against workplace discrimination and ensures access to public facilities, commercial establishment, and telecommunications services.[14] In the area of employment, the ADA provides that no employer subject to the Act shall "discriminate against a *qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). The statute further defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* at § 12111(8).

To establish a *prima facie* claim under the ADA, a plaintiff must show that: "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of

---

[14] The ADA Amendments Act of 2008 (ADAAA), 42 U.S.C. § 12102 (Supp. 2009), broadened the definition of disability and overturned the Supreme Court's decisions in *Sutton v. United Airlines,* 527 U.S. 471 (1999), and other cases. Plaintiff suggests in her opposition to summary judgment that this Court should discount case law predating the 2008 amendments, particularly *Siefken v. Village of Arlington Heights,* 65 F.3d 664 (7th Cir. 1995). *See* Pl.'s Resp. 22. We agree with Defendants that the 2008 Amendments are not germane to the issues the parties dispute in this case; neither party, after all, contends that Plaintiff is not disabled.

her job either with or without reasonable accommodation, and (3) she has suffered from an adverse employment decision because of her disability." *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); *Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002). An employee may state a claim for discrimination under this portion of the ADA in one of two ways. *See Basith v. Cook County,* 241 F.3d 919, 926–927 (7th Cir. 2001). First, she can claim that she suffered disparate treatment—in other words, that the employer treated her differently *because of* her disability.[15] *See Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021–1022 (7th Cir. 1997). Second, an employee may claim that her employer violated the ADA by failing to provide a reasonable accommodation for her known disability. *Spurling,* 739 F.3d at 1061. This "failure to accommodate" cause of action derives from the statute's provision that the definition of discrimination includes: "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. § 12112(b)(5)(A); *see also Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1283 (7th Cir. 1996).

## II.     Plaintiff's Failure to Accommodate Claim

---

[15] As with actions for discrimination under Title VII of the Civil Rights Act, a plaintiff may present proof of discrimination either directly or indirectly; the "indirect" method corresponds to the burden-shifting *McDonnell Douglas* framework. *See Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). A successful "failure to accommodate" claim constitutes direct proof of discrimination in violation of the ADA, obviating the need for indirect proof or the burden-shifting method. *See Bultemeyer v. Fort Wayne Cmty. Sch.,* 100 F.3d 1281, 1283 (7th Cir. 1996) ("If it is true that [defendant] should have reasonably accommodated [plaintiff's] disability and did not, [defendant] has discriminated against him. There is no need for indirect proof or burden shifting.").

Plaintiff claims that WTFD violated the ADA by terminating her after she suffered low blood sugar episodes rather than providing a reasonable accommodation for the effects of her diabetes disability.

In order to prevail on a "failure to accommodate" ADA claim, a plaintiff must set forth evidence establishing that: "(1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) (citing *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001)). Here, the parties do not dispute that Plaintiff's type 1 diabetes constitutes a "disability" within the meaning of the ADA. *See* 29 C.F.R. § 1630.2(j)(3)(iii) ("it should easily be concluded that . . . diabetes substantially limits endocrine function"); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923–924 (7th Cir. 2001) (holding that claimant with insulin-dependent diabetes was disabled in the major life activity of eating because of this endocrine impairment). *But see Sheerer v. Potter,* 443 F.3d 916, 919 (7th Cir. 2006) (cautioning that diabetic status is not a *per se* disability). There is at least a genuine issue of material fact here as to whether Plaintiff's diabetes, whose hypoglycemic episodes can produce "impaired ability to think coherently and loss of consciousness or cognitive ability," substantially limits her in one or more major life activity. *See Nawrot v. CPC Int'l*, 277 F.3d 896, 904 (7th Cir. 2002).

Nor does WTFD dispute that it was aware of Plaintiff's diabetes at the time it terminated her and allegedly failed to accommodate her disability. The parties disagree in their recollection of the justification Deputy Chief Scott gave Plaintiff when he informed her of her termination in person, but Scott never asserted that the hypoglycemic episodes were not the precipitating cause of WTFD's decision. *See* Pl.'s Resp. 5–6. WTFD's letter of termination explicitly stated that

"[y]our separation of employment is due to unsolicited discovery of medical events caused from your diabetes." Pl.'s Ex. 15.

We are thus left to address two issues in resolving Defendants' motion for summary judgment: whether Plaintiff was a *qualified* individual with a disability, and, if so, whether WTFD failed to reasonably accommodate her disability.

## A. "Qualified individual with a disability"

A "qualified individual with a disability" is a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 659–660 (7th Cir. 2005). Federal regulations provide some guidance to courts in determining what constitute the "essential functions" of a given position. They provide that a function may be essential because the reason the position exists is to perform that function, there are a limited number of employees among whom the performance of the position can be distributed, or the function is so highly specialized that an employee was hired for her expertise in performing it. 29 C.F.R. § 1630.2(n)(2). The regulations further suggest that the following factors can serve as evidence that a given function is essential: (1) the employer's judgment as to which functions are essential, (2) written job descriptions that predated the occurrences giving rise to the suit, (3) the amount of time spent on the job performing the function, (4) the consequences of not requiring an employee to perform the function, (5) the terms of any applicable collective bargaining agreement, (6) the work experience of past incumbents in the job, and/or (7) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3).

In arguing that, as of June 2011, Plaintiff was unable to perform the essential functions of her paramedic position, WTFD relies primarily on the Department's written job description,

which was adopted in 2001—well before Plaintiff was hired. The job description requires that a paramedic, among other skills, be able to: "safely and effectively operate emergency and non-emergency vehicles under all conditions," "monitor[] [a] patient while in transport and continue[] treatment as indicated," and "exercise judgment in unique and ever-changing environments, make quick, appropriate and rational decisions, perfo[rm] complex tasks, remain calm, and bring order to stressful situations." Konzen Aff., Ex. 1 at ¶¶ 4.1.5, 4.6, 4.7.1. Where not contradicted by evidence that they are ignored in practice, we grant substantial deference to an employer's statement of its own job requirements. *See DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998) ("Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job.") (citations omitted).

Plaintiff cannot dispute that, at least twice—once in 2009 and once in January 2011—hypoglycemic episodes compromised her ability to drive an ambulance. On both occasions, she failed to follow the correct route and became sidetracked; in January 2011, she failed to respond to the instructions of her partner and drove in a sufficiently erratic fashion that two police cars intervened. *See* Rednour Dep. 108, 122; Barry Dep. 94–96. During the June 2011 incident, an episode of low blood sugar rendered her unable to monitor and treat a patient while in transport to the hospital, and, by her own admission, undermined her ability to exercise judgment and perform tasks such as inserting an IV for a patient. Rednour Dep. 75, 88–89.

Plaintiff does not dispute that her two hypoglycemic episodes during a six-month period in 2011 impacted her ability to perform the essential functions of a paramedic; rather, she focuses her argument on WTFD's decision to fire her in July 2011 rather than accommodate the

effects of her disability.[16] She asserts that two reasonable accommodations existed at the time of her termination: a two-to-four week period of limited duty as proposed by WTFD's physician, Dr. Steven Moffatt, and the use of a continuous glucose monitor as proposed by Plaintiff's expert, Dr. Charles Clark. Defendants address these proposed accommodations directly, contending that neither accommodation is "reasonable"; they also set forth two broader arguments that Plaintiff cannot, or need not, be accommodated at all, and thus is not a qualified individual under the ADA. First, they assert that since the remedies for her diabetic episodes are "under her control," Seventh Circuit precedent forecloses the need for employer-provided accommodations. Second, they contend that since Plaintiff's disability rendered her a "direct threat" to the well-being of herself and others while on the job, it was not amenable to accommodation. We discuss Plaintiff's proposed accommodations and Defendants' counterarguments in turn.

### 1. Plaintiff's proposed accommodations

A plaintiff bears the burden of showing that she can perform the essential functions of her job "with or without reasonable accommodation." *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Circuits,* 601 F.3d 674, 680 (7th Cir. 2010); *Vandalsen v. Chrysler Grp., LLC,* 2014 WL 1323630, at *7 (S.D. Ind. Mar. 31, 2014). With respect to the existence of reasonable accommodations, a plaintiff need only make the initial showing "that an

---

[16] Plaintiff does dispute a number of Defendants' characterizations of the serious, chronic nature of her diabetes. For instance, she contends that it is a mischaracterization for Defendants to refer to her diabetes as "uncontrolled" based on her A1c score, Pl.'s Resp. 14, and she points to the testimony of Sparks and Barry that, over the totality of her time at WTFD, she performed her job well. *See* Pl.'s Resp. 11 (citing Sparks Dep. 42–43; Barry Dep. 63–64, 140–141). By devoting the thrust of her opposition to summary judgment to Defendants' failure to accept a proposed accommodation, however, Plaintiff implicitly concedes that she needed some assistance in fulfilling all the job's essential functions.

'accommodation' seems reasonable on its face, *i.e.,* ordinarily or in the run of cases." *E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760, 762 (7th Cir. 2012) (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 398 (2002)). The burden then shifts to the defendant to "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances," rendering the proposed accommodation unreasonable in fact. *Barnett,* 535 U.S. at 402; *E.E.O.C. v. United Airlines,* 693 F.3d at 762.

### a. Dr. Moffatt's proposal for two-to-four week light duty status

In reviewing the status of Plaintiff's employment after the June 22 incident, Deputy Chief Scott solicited the opinion of Dr. Steven Moffatt, who regularly works with WTFD in examining employees and providing fitness-for-duty opinions. *See* Moffatt Dep. 42–44. As Dr. Moffatt recalls, Scott tasked him with answering the following questions with regard to Rednour: "Is she adequately controlled with regard to her diabetes, is she compliant with regard to her treatment, and is there potentially anything else that is being missed with regard to her condition that might warrant further evaluation." *Id.* at 43. In a letter dated July 7, 2011, Dr. Moffatt advised Scott that:

> It could be a reasonable accommodation to allow for a more significant timeframe to determine whether or not she has responded to the adjustment in the basal dose insulin and no further episodes of hypoglycemia. The approach may be *restrictive duty for a length of time of approximately 2-4 weeks* with no episodes of hypoglycemia and a return to duty after the determined timeframe . . . .
>
> She may return to *limited duty* status with no driving departmental vehicles until such time as the 2-4 week interval has been achieved with no further episodes of hypoglycemia requiring supplementation.

Moffatt Dep., Ex. 6 at 1–2 (emphasis added). Plaintiff argues that a 2-4 period of "limited duty" status as suggested by Dr. Moffatt was a reasonable accommodation.

Federal regulations implementing the ADA help define a reasonable accommodation, as applied to an existing employee, as consisting of: "Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). Examples of such accommodations include "[j]ob restructuring, part-time or modified work schedules; reassignment to a vacant position, [and] acquisition or modifications of equipment or devices." *Id.* at § 1630.2(o)(2).

Here, Plaintiff has met her initial burden of showing that reassignment to light-duty status may constitute a reasonable accommodation to her disability. At least in the context of injuries suffered on the job, the Seventh Circuit has held that "our case law and the EEOC's interpretation of the ADA have approved of an employer's offer of light-duty assignments as a reasonable accommodation." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 696 (7th Cir. 1998) (citing *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 680 (7th Cir. 1998); *EEOC Enforcement Guidance: Workers' Compensation and the ADA,* 8 FEP Manual (BNA) at 405:7401 (1996)). WTFD's own Rules and Regulations manual provides for limited duty subsequent to physical or mental disability, without explicitly limiting this form of accommodation to "on the job" injuries. Pl.'s Ex. 19 at 107. It states that "[a]ny employee whose physical or mental incapacity is such that they are temporarily unable to perform primary job assignments but, in the opinion of the department physician, my perform limited duty under certain specified restrictions, is eligible for assignment . . . to limited duty status." *Id.* The manual further explains that limited duty status may extend for up to one year from the onset of illness/injury, depending on circumstances. *Id.*

Defendants do not contend that a two-to-four week period of "light duty" status would have been unduly burdensome to WTFD; rather, they argue that such a period would not have ameliorated the low blood sugar problem and thus did not constitute an accommodation. Defs.' Reply Br. 9–12. In her deposition, Rednour stated that she did not know what had caused her low blood sugar episode in January 2011. Rednour Dep. 114. Regarding the June 2011 incident, she recounted that she had thought at the time that an adjustment to her insulin pump would be the solution to her hypoglycemic episodes. *Id.* at 107. In her declaration in opposition to summary judgment, Plaintiff presents a somewhat different, and not entirely coherent, picture of the evolution of her understanding of the problem—and need for accommodation. In the affidavit, she states: "I suspected that my blood sugar issue on January 26, 2011 was caused by my being awakened from sleep at night because my blood sugar is typically lower during my sleep than throughout the day." Pl.'s Ex. 22 (Rednour Declaration) at ¶ 5. According to her account, she then spoke on the phone with Dr. Wentworth, who adjusted her nighttime basal insulin dose in order to avert future low blood sugar levels on nighttime runs. *Id.* at ¶ 6. In her declaration in opposition to summary judgment, she also states that in 2010 she realized that her blood sugar was becoming unpredictable during her menstrual cycles because she was pre-menopausal; she further asserts: "I believe that the incidents in January and June 2011 were caused by these hormonal fluctuations." *Id.* at ¶¶ 15–18. While she initially claimed that she consulted with her gynecologist, Dr. James Brillhart, about the effect of these hormonal fluctuations on her blood sugar at the time, her supplemental declaration states that she did not undergo such consultations—a statement corroborated by Dr. Brillhart, who has stated that Rednour never discussed her low blood sugar episodes with him during this time period. *See* Rednour

Supplemental Decl. ¶ 2; Brillhart Dep. 26.[17] Rednour claims that after her June 2011 incident—

and after she was terminated by WTFD—she took two steps: (1) with Dr. Wentworth, she

adjusted her basal dose of insulin "to compensate for these fluctuations"; and (2) she began

hormone therapy in 2012. Since taking those steps, she asserts that she has not experienced a

significant issue with low blood sugar at work. *Id.* at ¶¶ 19–20.[18]

Defendants push back against this account in two respects: they challenge Rednour's

competence to state the cause of her low blood sugar episodes as of June 2011, and they assert

---

[17] While Brillhart has testified that Rednour never consulted with him about the hormonal changes as they interacted with her diabetes, at least before her termination, his testimony does acknowledge that he consulted with her about her premenopausal hormone fluctuations in 2012. Brillhart Dep. 26–27.

[18] Defendants argue that Rednour's declaration in opposition to summary judgment should be disregarded under the "sham affidavit" rule because it contradicts her deposition testimony. Defs.' Reply 6, 9 (citing *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–1169 (7th Cir. 1996)). Specifically, they allege that the declaration is at odds with the deposition in two respects: (1) she now asserts that she recognized a hormonal problem was contributing to her 2011 blood sugar fluctuations, Rednour Decl. ¶¶ 15–18, whereas in her deposition she stated that she did not know the cause of her January 2011 incident, Rednour Dep. 114; and (2) that the declaration at least implicitly contradicts her deposition testimony that she had not requested an accommodation after the June 2011 incident, *see* Rednour Dep. 106–107. Plaintiff retorts that the questions Rednour was asked in her deposition—both regarding her assessment of the cause of her low blood sugar in January 2011 and whether she requested accommodation in June 2011—were limited in scope to "one suspended moment in time." Pl.'s Sur-reply 8. Plaintiff notes that Defendants were aware of Rednour's hormonal imbalance theory at the time they took her deposition, but nonetheless chose not to elicit testimony on that question. Because we agree that Rednour's declaration does not directly contradict her deposition, we will not strike the declaration. *See Bamcor LLC v. Jupiter Aluminum Corp.*, 767 F. Supp. 2d 959, 978 (N.D. Ind. 2011) ("[A]ffidavits offered to clarify or expand on the witness'[s] testimony are admissible if the line of questioning at the deposition was ambiguous or incomplete."). Inconsistencies may prove relevant to Plaintiff's credibility, but the affidavit is not so clearly aimed at the creation of "sham" issues of fact that it must be stricken at this stage. *Sjoblom v. Charter Commc'ns, LLC,* 571 F. Supp. 2d 961, 970 (W.D. Wis. 2008) ("Although the discrepancies may be relevant in determining the credibility of the witness or weighing the evidence, they do not mandate striking the objectionable paragraphs.") (citing *Turner v. Miller,* 301 F.3d 599, 604 (7th Cir. 2002)). One of the contradictions that Defendants claimed existed between the Rednour deposition and declaration was later partially undone by Rednour's supplemental declaration, in which she stated that she had not, in fact, consulted with her gynecologist about the low blood sugar episodes. Rednour Supplemental Decl. ¶ 2.

that there is no evidence to show that Dr. Moffatt's proposed two-to-four weeks of light duty would have solved the problem. As to the first objection, Defendants rightly note that "Rednour cannot testify as to medical causation." Defs.' Reply 9. Two medical doctors who have familiarity with Rednour's case, however, gave testimony that is at least arguably consistent with Rednour's account.[19] Dr. Moffatt, WTFD's consultant, averred in his letter to Scott that, based on a discussion with her treating endocrinologist Dr. Wentworth, he believed that "adjustment in her basal dose [of insulin] will solve this particular issue." Pl.'s Ex. 9 at 1. He suggested that Rednour be placed on light duty for two to four weeks as a trial period, after which he could examine her to determine if the adjustment had worked, or if any other adjustments were needed. *Id.* at 2. Because WTFD did not accept his recommendations, Dr. Moffatt was never able to determine the efficacy of this plan himself. Moffatt Dep. 59. Dr. Wentworth, however, did continue to examine Rednour in subsequent months. His notes from October 2011 indicate that he had changed her base dose to contain less concentrated insulin and changed her dose timing to produce less overlap between insulin doses. Wentworth Dep. 80–81. Records from the next appointment, in January 2012, indicate that Rednour's "A1c" score had increased—reflecting higher blood sugar levels. *Id.* at 81. Though notes from subsequent examinations record that Rednour continued to experience "occasional" episodes, Rednour reported to Wentworth that she now "always knows why" they are occurring. *Id.* at 82. As Wentworth testified, "[s]he balances them out and does treat them, and they're in a range that—where she likes to be"; Wentworth

---

[19] Dr. Moffatt and Dr. Wentworth do not testify to any possible hormonal fluctuations. Whether or not premenopausal hormonal fluctuations *actually* caused Rednour's blood sugar problems is not material; while Defendants' argument that Rednour cannot testify to medical causation is well-taken, *see Armstrong v. Cerestar USA, Inc.*, 775 N.E.2d 360, 366 (Ind. Ct. App. 2002), we could infer that Plaintiff's beliefs regarding her hormones were entirely mistaken and still find that Dr. Wentworth and Dr. Moffatt have presented evidence that a light duty period could have enabled an adjustment to Rednour's treatment that would have proven efficacious.

further asserted that such occasional episodes were "not really" a concern. *Id.* at 82–83. Plaintiff has thus pointed to grounds upon which a reasonable juror could find that an adjustment in her insulin dose represented a solution to the unpredictable low blood sugar episodes Rednour was experiencing at work.

Defendants relatedly contend, however, that, regardless of the whether dose adjustments were the solution to Rednour's problem, there is no evidence that they could have been effectuated within the two to four week window Dr. Moffatt suggested. Defs.' Reply 10. The accommodation Rednour really needed, they argue, was an "indefinite" one, which case law establishes is an unreasonable request of an employer. *Id.* at 11 (citing *Vandalsen v. Chrysler Grp., LLC,* 2014 WL 1323630, at *8 (S.D. Ind. Mar. 31, 2014). It is indisputable that—as events actually unfolded—Rednour neither made efficacious adjustments to her basal insulin dose nor addressed her putative hormonal fluctuations until after Dr. Moffatt's proposed initial window had closed. But WTFD terminated Rednour before any such trial adjustment period could occur. As Plaintiff points out, it is entirely reasonable to posit that, were she acting according to a fixed timeline and with her job on the line, Rednour might have sought solutions to her low blood sugar problem at a faster pace. Her willingness to tolerate lower blood sugar levels—coupled with a higher risk of hypoglycemic episodes—while *off the job* cannot logically be conflated with speculation about how aggressively she would have approached her treatment had WTFD implemented the proposed accommodation. At any rate, there exists considerable middle ground between a two-to-four week period and a truly "indefinite" one. WTFD's own rules and regulations manual envisions procedures for reevaluation and limited 30-day extensions of light duty status, coupled with a mechanism for terminating such an accommodation period "if the

prognosis becomes such that return to duty is very unlikely regardless of time given for recovery." Pl.'s Ex. 19 at 107.

Defendants have not put forth any evidence demonstrating that the accommodation proposed to them by Dr. Moffatt would have imposed an "undue hardship" and thus would be unreasonable. *Cf. Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995) (setting forth the requirements for an "undue hardship" showing). Since there is at least a triable issue of fact whether such a proposal would have rendered Rednour able to perform the essential functions of her job had it been implemented, we cannot at this stage conclude that Rednour was not a "qualified individual"—with this accommodation in place—as a matter of law.

### b. Dr. Clark's proposal for use of a continuous blood glucose monitor

Plaintiff also designates the testimony of an expert witness, Dr. Charles Clark, who opines that Rednour's use of a continuous blood glucose monitor would have ameliorated her problems with unexpected fluctuations in blood sugar. Pl.'s Ex. 28 (Clark Expert Report). As Clark describes it, such a monitor sends an alert whenever the wearer's blood sugar reaches a pre-determined point and immediately alerts the wearer to activate the insulin pump to which it is attached." *Id.* at 11–12; *see also* Rednour Decl. ¶ 13. According to Clark's testimony, the monitor would have allowed Rednour to "safely and effectively serve as a paramedic and perform the essential duties of a paramedic without fundamentally altering the nature of the services of WTFD or creating an administrative or financial burden to WTFD." *Id.* at 11–12. He further asserted that the device "would have been a reasonable accommodation because it was affordable to Ms. Rednour and would have greatly reduced the chances of Ms. Rednour experiencing a blood sugar fluctuation." *Id.*

The ADA provides that a reasonable accommodation "may include . . . acquisition or modification of equipment or devices . . . and other similar accommodation for individuals with disabilities." 42 U.S.C. § 12111(9). *See also* 29 C.F.R. § 1630.2(o)(2) ("A reasonable accommodation may include but is not limited to . . . acquisition or modification of equipment or devices . . . ."). Although we are unaware of any previous courts' analysis of the reasonableness of the device Clark has proposed as an accommodation, there is no doubt that an employer's duty to provide accommodations to disability may include a responsibility to facilitate a diabetic employee's monitoring of her blood sugar levels. *See generally Nawrot v. CPC Intern.*, 259 F. Supp. 2d 716, 726–727 (N.D. Ill. 2003). As the statute makes clear, the accommodation an employee needs may consist of changes in the structure of her work; it may also, however, involve providing the employee with physical devices that enable her to perform the job's essential functions. *See, e.g., Bryant v. Better Business Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 738–741 (D. Md. 1996) (holding that the acquisition of a hearing-aid device for a hearing-challenged employee was a reasonable accommodation and did not impose an "undue hardship"). *Cf.* 29 C.F.R. § 1630, Appx. (Interpretive Regulations, § 1630.9). (noting that an employer is not required to bear the cost of equipment or devices, such as wheelchairs, that aid employee significantly outside the work context).[20]

---

[20] Plaintiff has offered no evidence that Rednour ever suggested the continuous blood glucose monitor as an accommodation, or that Defendants failed to accommodate Rednour by providing it as an accommodation as part of the "interactive process" in which they were required to engage. *See below.* Dr. Clark's testimony with respect to this accommodation is offered for the limited purpose of showing that Plaintiff was a "qualified individual with a disability"—in other words, that she was capable of performing the essential functions of her position with reasonable accommodation.

Defendants do not contend that a continuous blood glucose monitor is an unreasonable accommodation.[21] Rather, they challenge Dr. Clark's authority to offer expert testimony. Specifically, they insist that portions of his testimony constitute impermissible "legal opinions," Defs.' Reply 14 (citing *Jimenez v. City of Chi.*, 732 F.3d 710, 721 (7th Cir. 2013)), including the nature of WTFD's obligations under the ADA, what constitutes a "reasonable accommodation," and whether WTFD bore "animus" toward Rednour. *Id.* They further argue that Dr. Clark, not being familiar with WTFD's financial information, lacks the competence to opine "as to whether placing Rednour on limited duty would have fundamentally altered the nature of WTFD's services or created an administrative or financial burden on WTFD." *Id.*

Under the Supreme Court's construction of Federal Rule of Evidence 702 as set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), we are to engage in two inquiries in determining the admissibility of expert testimony. This framework requires the district court to determine whether (1) the proposed witness "would testify to valid scientific, technical, or other specialized knowledge and (2) his testimony will assist the trier of fact." *Ammons v. Aramark Unif. Servs.*, *Inc.,* 368 F.3d 809, 816 (7th Cir. 2004) (quoting *NutraSweet Co.. v. X-L Eng'g Co.*, 227 F.3d 776, 787–788 (7th Cir. 2000)). Plaintiff has set forth Dr. Clark's qualifications as an expert on diabetes, *See* Pl.'s Ex. 28 at 1–2; Pl.'s Ex. 28, Ex. A (Clark *curriculum vitae*), which Defendants do not challenge; it seems clear, moreover, that his opinions would assist in resolving at least one factual question: whether a continuous blood sugar monitor would have assisted Rednour in preventing the unexpected low blood sugar episodes that

---

[21] They *do* contend that such a monitor is not an accommodation at all, because it is a device "completely under [Rednour's] control." Defs.' Reply 7. We address this argument below.

undermined her ability to perform her job's functions. *See* Pl.'s Ex. 28 at 11 (Section 3).[22] We conclude that, while Dr. Clark may not possess sufficient familiarity with WTFD to offer expert testimony on whether an accommodation is unreasonable as an "undue hardship" on the employer, he is qualified to opine on whether a monitoring device would help Rednour in ensuring that low blood sugar episodes do not interfere with her work. *See* Pl.'s Ex. 41 at ¶¶ 1–7. *Cf. Steffy v. Cole Vision Corp.*, 2008 WL 7053517, at *5–7 (W.D. Wis. 2008) (holding that, although treating psychiatrist was competent to testify to the therapeutic value of proposed accommodations, he could not testify to their "reasonableness" because he was entirely unfamiliar with the ADA and workplace law). It is commonplace for ADA plaintiffs to employee expert medical or vocational testimony to show the existence of reasonable accommodations, *see* Peter David Blanck and Heidi M. Berven, "Evidence of Disability After Daubert," 5 *Psychology, Public Policy, & Law* 16, 26 (1999), and such testimony is all Plaintiff requires at this stage to meet her burden. We need not rule on the admissibility of all portions of Clark's testimony—particularly regarding whether WTFD engaged in the accommodation process or maintained an improper "blanket" policy against employees with diabetes, *see* Pl.'s Ex. 28 at 3–11—to determine that his statements on the efficacy of a blood sugar monitor are admissible expert testimony for this limited purpose.

Plaintiff has made the requisite initial showing with respect to her two proposed accommodations, and Defendants have declined to argue that either a period of light duty or the procurement of a blood sugar monitoring device would be unreasonable despite their apparent feasibility. Instead, they argue that providing Plaintiff reasonable accommodations was

---

[22] For the purposes of resolving this motion, we consider only Section 3 of Dr. Clark's expert report—the portion concerning his proposed accommodation. We reserve a ruling on the admissibility of the other portions of the report at trial.

unnecessary—and thus, that she is not a "qualified" individual, for two reasons: (1) her low blood sugar was entirely under control and her inability to perform the essential functions of a paramedic was due to her own refusal to take the necessary steps to control it; and (2) the nature of her disability made her a "direct threat" to the health of herself and others.

### 2. Plaintiff's "refusal" to control her diabetes and *Siefken*

Defendants argue that "Rednour cannot make a claim against WTFD under the ADA because she failed to control her condition. 'A plaintiff cannot recover under the ADA if through [her] own fault [s]he fails to control an otherwise controllable illness.'" Defs.' Br. 20 (citing *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 570 (7th Cir. 1997)) (additional citations omitted).

In support of this position, Defendants rely primarily on the Seventh Circuit's decision in *Siefken v. Village of Arlington Heights,* 65 F.3d 664 (7th Cir. 1995). In *Siefken,* the court held that a municipal entity's termination of a diabetic police officer after he suffered a hypoglycemic episode that caused him to erratically dr[i]ve his squad car at high speed through residential areas" did not violate the ADA. 65 F.3d at 666–667. Two considerations drove the *Siefken* court's holding. First, the court noted that the policeman had been terminated because of his "failure to alertly and accurately keep [himself] functional and monitor [his] disease"; this was *not* the same thing, it concluded, as terminating him because he had diabetes. *Id.* at 666 (citing *Despears v. Milwaukee County,* 63 F.3d 635, 636 (7th Cir. 1995), for the proposition that "mere 'but for' causation" is not necessarily sufficient to link disability and adverse action under the ADA). Second, the employee had requested no accommodation, either before his termination or during the course of the litigation. As the district court below stated: "No one has suggested how modification of policies, practices or procedures, or how the provision of auxiliary aids or services could eliminate the risk. No accommodation was ever requested, nor does one appear

possible, other than accepting plaintiff's assurance it will not happen again, and defendant is unwilling to run that risk." 1994 WL 505414, at *2 (N.D. Ill. Sept. 14, 1994). The only time the plaintiff in *Siefken* mentioned an accommodation was in argument before the Seventh Circuit. In the court's words: "Our decision is bolstered by a colloquy at oral argument. . . . When asked what accommodation Siefken would request, his counsel replied, 'A second chance.' But this is not an accommodation, as envisioned in the ADA." 65 F.3d at 666.

There are undoubtedly some factual similarities between Rednour's termination and the circumstances the court considered in *Siefken*. We conclude that *Siefken* is not controlling here, however, because neither of the two key factors the court identified are present. First, Plaintiff has set forth facts that could reasonably support an inference that WTFD terminated her because of her diabetic condition. Scott's official termination letter to her did not mention her behavior or her "failure to control" her blood sugar; rather, it advised that "[y]our separation of employment is due to unsolicited discovery of medical events caused from your diabetes." Pl.'s Ex. 15. Plaintiff also asserts that this official explanation is only one of several Scott offered her in the aftermath of her June 2011 incident. According to Rednour, Scott told her that she "must have fallen through the cracks," and that WTFD could not retain diabetic paramedics because they would not be covered by the Department's insurance. Rednour Dep. 167; Barry Dep. 174. He also justified her termination on the basis that the PERF program prevents individuals with type 1 diabetes from serving as emergency personnel.[23] Rednour Dep. 167. No matter which of these accounts is correct, it is at least arguable that WTFD terminated Rednour because of her

---

[23] "PERF" refers to the Police Officers' and Firefighters' Pension and Disability Fund. Plaintiff points out the civilian PERF fund does not have the same requirements with regard to "baseline physical examinations" as does the main fund. Pl.'s Ex. 1 at 163. Plaintiff therefore argues that this justification for Rednour's termination, to the extent that Scott or other WTFD personnel ever relied on it, is baseless. *See* Pl.'s Resp. 6 n.9.

condition itself, not any particular action on her part. Second, as we have already discussed, Plaintiff has offered evidence that accommodations existed that would have allowed her to perform the essential functions of her job as a paramedic.[24] *See supra,* § II(A)(1).

The Seventh Circuit concluded its decision in *Siefken* by explaining that its ruling was a narrow one:

> The Fifth Circuit has held, as a matter of law, that diabetics are not "otherwise qualified" under the ADA to perform certain jobs requiring driving. And the Third Circuit sustained an FBI regulation prohibiting diabetics from being employed as special agents. We express no opinion on these issues. We only hold that when an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet "the employer's legitimate job expectations," due to his failure to control a controllable disability, he cannot state a cause of action under the ADA.

*Id.* at 667 (citations omitted). *See also Brookins v. Indianapolis Power & Light Co.*, 90 F. Supp. 2d 993, 1006–1007 (S.D. Ind. 2000) (applying the "*Siefken* rule" where plaintiff "needed or requested no accommodation" and failed to control a controllable disability). This case is thus not within *Siefken*'s holding, and we reject Defendants' argument that the case law forecloses the possibility of an accommodation for Plaintiff.[25]

Nor are we persuaded by Defendants' related argument that the continuous blood glucose monitor proposed by Dr. Clark is not an accommodation at all because it is "a workplace adjustment exclusively within the employee's control." Defs.' Reply 7. Defendants contend that

---

[24] Whether she herself requested an accommodation at any time before WTFD terminated her is a separate question, which we address below.

[25] Because there remains an issue of fact whether WTFD terminated Rednour because of her diabetes, or rather because of her specific failure to control it, we do not need to decide at this stage whether, at the time of her hypoglycemic episodes, Rednour failed to prevent the onset of low blood sugar through her own "fault." *Cf. Van Stan,* 125 F.3d at 570 ("A plaintiff cannot recover under the ADA if through his own fault he fails to control an otherwise controllable illness").

this case is analogous to a recent decision of the Northern District of Illinois, *Johnson v. American Signature, Inc.*, 2014 WL 1254598 (N.D. Ill. Mar. 26, 2014). There, the court rejected the suggestion of a plaintiff with urinary incontinence that he could have been accommodated by being allowed to wear adult diapers. The plaintiff's claim for failure to accommodate, they noted, was undermined by the fact that the plaintiff "was aware of his inability to manage his urinary urges, yet never made any effort to ameliorate his condition." 2014 WL 1254598, at *4. Further, the court reasoned that the plaintiff's proposed accommodation did not qualify as such under the ADA. "Here, Johnson's decision to wear or not wear protective undergarments was a choice that was up to him alone. That he elected not to do so was his own matter and his belated offer to wear Depends cannot be viewed as anything other than an appeal to ASI for an opportunity to be allowed another chance to take steps to better control his urinary urgency." *Id.*

     *Johnson* is not binding precedent, and at any rate we conclude that Dr. Clark's proposed use of a continuous blood glucose monitor is distinguishable from the *Johnson* plaintiff's request to wear adult diapers. The device is expensive—with prices ranging from $999 to $1450—and Plaintiff contends reasonably that she would have required the support of WTFD to acquire it. Pl.'s Sur-Reply 5 (citing Pl.'s Ex. 41, ¶ 9). Moreover, because it emits a signal visible that would be visible to Rednour as well as a partner on duty, it would serve to allow both members of a team to monitor her blood sugar and be aware of any incipient fluctuation. *Id.* at 5–6.

     More broadly, there is evidence here supporting Plaintiff's contention that the episode that prompted her termination was not the result of her "refusal" to control her condition. After her first serious hypoglycemic incident on the night of January 26, 2011, Rednour decided, in conjunction with her partner Barry, that she would take precautions to avoid a recurrence: she

would avoid driving the ambulance on night runs,[26] she would test her blood sugar before every emergency run, and she would keep a "coke" on hand in the ambulance to enable her to bring her blood sugar back up quickly if it cratered. Rednour Dep. 106–107; 112–115, 158–159; Barry Dep. 45–48. According to Rednour, she also called her endocrinologist, Dr. Wentworth, to discuss a modification to her nighttime insulin dosage. Rednour Dep. 105.[27] Her next low blood sugar incident, on June 22, occurred, by contrast, during the daytime. Rednour did not drive the ambulance, and she recounts that she had tested her blood sugar some 30-60 minutes before the run. Rednour Dep. 88–89.[28] She had brought a soda in the ambulance, though she left it in the front seat and did not drink it when she began to feel "off" in the back compartment of the ambulance on the way to the hospital. *Id.* at 75–76.

The testimony of the two doctors who examined Rednour during this period is also inconsistent with the notion that Rednour was negligent in treating her diabetes. Although Dr. Wentworth noted Rednour's tendency to "overcompensate for highs [in blood sugar]," he went on to describe that predicament as "pretty much a universal problem" among patients. Wentworth Dep. 78. He further noted that Rednour "monitors her blood sugars closely," and he affirmed that, apart from one missed appointment, she had a good record of making regular visits so that he could monitor and adjust her care. *Id.*[29] Dr. Moffatt, WTFD's retained physician,

---

[26] In her deposition, Rednour stated that she does not know (now) why her blood sugar had gone down and precipitated the January 2011 incident. As her deposition also indicates, however, she suspected at the time that the nighttime nature of the emergency run was the predominant cause of the problem. Rednour Dep. 114–117.

[27] Dr. Wentworth does not have a record of this phone call, but he stated in his deposition that he does not always chart phone calls from patients. Wentworth Dep. 7–8, 126. For the purposes of ruling on this motion, we treat Rednour's account as true.

[28] The parties dispute whether Rednour had agreed after the January 26 incident to test her blood sugar prior to *all* runs, or only prior to nighttime runs. *See* Pl.'s Resp. 9 n.16.

[29] In his words: "I mean, over that period of time, it would have probably been only one missed appointment. It's actually a pretty good record." Wentworth Dep. 78.

stated that his task in evaluating Rednour's fitness to return to duty after the June 2011 incident was, in part, to determine "whether or not there is blatant non-compliance . . . issues where [she doesn't] keep regular contact with [her] physician on top of an incidence of hypoglycemia or syncope . . . or something of that nature that indicates [her] . . . diabetes is out of control." Moffatt Dep. 41. Dr. Moffatt believed that Rednour was a "responsible" patient, and that conclusion informed his recommendation that she be allowed a trial period and the opportunity to return to work. *Id.* at 42. *See Girten v. Town of Schererville,* 819 F. Supp. 2d 786, 802–803 (N.D. Ind. 2011) (finding a diabetic plaintiff's case "miles apart" from *Siefken* where the evidence demonstrated he was diligent in attempting to control his blood sugar).

Defendants have pointed to some facts that could support an inference that Rednour had the means to control the effects of her diabetes—and was simply irresponsible in failing to do so: she missed an appointment with Dr. Wentworth that, according to her customary schedule, should have occurred between the January and June 2011 incidents; she did not test her blood sugar *immediately* before the ambulance run; she did not have a soda or sugar source ready at hand when she began to experience low blood sugar symptoms in the back of the ambulance during the June 2011 incident; and she had a long-term tendency to keep her blood sugar at the low end of the normal range. A fact-finder's determination that the June 2011 incident was proximately caused by her own poor decision-making rather than her diabetes would mean that Rednour is not a "qualified" individual under the logic of *Siefken. See* 65 F.3d at 666–667. But because there is a triable issue of fact, we cannot decide the question as a matter of law.

### 3. "Direct threat"

Defendants also argue that Rednour was not a qualified individual with a disability because she posed a "direct threat to her safety and the safety of her partner, the public, and her patients." Defs.' Br. 28.

An employee is ineligible to bring a claim under the ADA if she presents a "direct threat" to her own health and safety or that of others, *see Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669 (7th Cir. 2000); federal regulations implementing the ADA further define a direct threat as a "significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. 29 C.F.R. § 1630.2(r); *Branham v. Snow,* 392 F.3d 896, 906–907 (7th Cir. 2004). "The determination that [an employee] poses a direct threat must be premised upon 'a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job.'" *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005) (citing *Chevron U.S.A. Inc. v. Echazabal,* 536 U.S. 73, 86 (2002)).

Defendants present no evidence that a "reasonable medical judgment" compels the conclusion that Rednour is a direct threat. In fact, the only medical "individualized assessment" of Rednour that Scott had at his disposal in making his termination recommendation—the one WTFD commissioned from Dr. Moffatt after the June 2011 incident—suggested to Scott precisely the opposite opinion. Dr. Moffatt acknowledged that part of his responsibility in conducting fitness for duty evaluations is to determine whether an "individual with diabetes simply is too much of a threat to safety"; in Rednour's case, however, he found her condition amenable to accommodation. Moffatt Dep. 41–42.[30]

---

[30] The colloquy between counsel and Dr. Moffatt was as follows:

Defendants assert that the testimonial evidence offered by Rednour's former partner Jamie Barry, coupled with Rednour's own account and the "objective evidence of what occurred at each scene" during the 2011 incidents, is sufficient evidence to compel the conclusion that Rednour was a direct threat to herself and others. Defs.' Br. 31. They rely on two Seventh Circuit cases—*Bekker v. Humana Health Plan, Inc.,* 229 F.3d 662, 669 (7th Cir. 2000), and *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005)—to buttress the notion that this sort of "testimonial evidence can provide sufficient support for a direct threat finding under the ADA." Defs' Br. 31 (citing *Darnell,* 417 F.3d at 660). We find Defendants' attempted analogy with neither case to be persuasive.

In *Bekker,* a doctor's employer terminated her after receiving reports that the doctor had been under the influence of alcohol while seeing patients. 229 F.3d at 667. The court noted that the employer had received numerous reports from both patients and co-workers that they had smelled alcohol on the plaintiff at work; the court further noted that the plaintiff had refused the employer's offer to keep her job in exchange for accepting certain conditions. *Id.* at 668 (affirming the factual findings of the district court). Although one co-worker reported that he did not think the plaintiff was guilty of drinking at work or arriving at work intoxicated, no documented medical opinion contradicted the threat assessment the employer pieced together from this testimonial evidence. *Id.* In *Darnell,* the Seventh Circuit did indeed state that

---

"[Moffatt]: The majority – the overwhelming majority of decisions that I make for a department is that you have to restrict their duty. As far as making a decision with regard to dismissing them is not my decision. It's a decision of what duties can they perform safely.

Q: Yeah. I understand that. But there is a point where you as the occupational physician say this individual with diabetes simply is too much of a threat to safety or an undue burden –

[Moffatt]: Yes.

Q: -- and I hereby as an occupational physician employed – engaged by entity XYZ am recommending that this person not be returned to work at all." Moffatt Dep. 41–42.

"testimonial evidence can provide sufficient support for a direct threat finding." 417 F.3d at 660. The "testimonial evidence" to which the court was referring, however, was not the direct instigator of the employer's termination decision; rather, the employer relied on a doctor's "individualized assessment" of the employee's direct threat status, a report which had *in turn* relied partially upon the testimonial evidence gathered from other observers. *Id*. The doctor reported to the employer that the plaintiff, who was diabetic, was "not capable of performing the physical requirements of the job because of his "uncontrolled diabetes mellitus." *Id.* at 659.

Here, Deputy Chief Scott received a report from Dr. Moffatt recommending that Rednour be accommodated with light-duty status. Moffatt Dep., Ex. 6. Against this weighed testimonial evidence from Barry, who had written that he had "concern for my well being and safety as well as Paramedic Radnor's [sic] ability to provide safe and competent patient care." Barry Dep., Ex. 32 (letter dated June 22, 2011). Scott also performed his own internet research on the subject of Rednour's type 1 diabetes, *see* Scott Dep. 271–275, and discussed the situation with Rednour's immediate superiors, Sparks and Morgan.[31] Fire Chief Konzen had delegated the initial decision-making process to Scott, and he accordingly accepted Scott's recommendation that Rednour be terminated primarily on the strength of that recommendation. *See* Konzen Dep. 51. The information on which WTFD acted here is comparable to neither the avalanche of unfavorable testimonial evidence—uncontradicted by medical expert opinion—present in *Bekker, cf.* 229 F.3d at 667, nor the explicit medical finding of direct threat present in *Darnell, cf.* 417 F.3d at 659.

---

[31] Sparks's Deposition reflects that Sparks forwarded Scott the thoughts of another department-affiliated physician, Dr. Dan O'Donnell. Sparks Dep. 114. However, Dr. O'Donnell did not examine Rednour, and Defendants do not contend that he offered a medical analysis that she was a direct threat. *See* Sparks Dep. 114–118.

We agree with Plaintiff that the evidence supporting WTFD's decision with regard to Rednour's status as a "direct threat" was "neither the best available objective evidence nor the most current medical knowledge based on Rednour's individual prognosis." *See* Pl.'s Resp. 33. Dr. Moffatt's analysis was the result of his in-person examination of Rednour, and he brought to bear more expertise than did either Barry's admittedly subjective opinion or Scott's own freelance research. At the very least, Defendants have not shown "that the evidence on the question of direct threat is so one-sided no reasonable jury could find" for Rednour, as they must to prevail on summary judgment on the issue. *See Branham,* 392 F.3d at 907 (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 251–252 (1986)).[32]

## B. WTFD's failure to accommodate the disability

If Rednour was a "qualified individual with a disability," then WTFD violated the ADA if it failed to reasonably accommodate that disability. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). Under the ADA, an employee begins the accommodation "process" by informing his employer of his disability; at that point, an employer's "liability is triggered for failure to provide accommodations." *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998)). Once an employer's responsibility to provide reasonable accommodation is triggered, the employer must engage with the employee in an "interactive process" to determine

---

[32] Plaintiff has also pointed to a number of news articles or government reports concerning the risk of fatality from heart ailments, in support of the notion that "[T]here is no shortage of emergency personnel incidents while on duty, and these sort of incidents may pose a substantially greater risk than Rednour." Pl.'s Resp. 34 (citing Pl.'s Exs. 25, 26, 27, & 32). We do not reach this issue because we find that the support for Defendants' "direct threat" assessment falls short of what is required for summary judgment; whether diabetes as a general matter is more or less risky for paramedics than other conditions does not enter into this conclusion.

the appropriate accommodation under the circumstances. *Id.* (quoting *E.E.O.C. v. Sears, Roebuck,* 417 F.3d at 797).

Defendants do not contend in their brief in support of summary judgment or elsewhere that they ever engaged in an "interactive process" with Rednour to seek an appropriate accommodation—either after the June 2011 or at any earlier time during her employment. Nor does the evidence support the conclusion that they ever communicated with Rednour about accommodations. *See Rehling v. City of Chi.*, 207 F.3d 1009, 1015–1016 (7th Cir. 2000) (noting that the interactive process entails communication between the employer and employee). Gene Konzen, the Fire Chief with final responsibility for the decision to terminate Rednour, affirmed that he never engaged in an "interactive dialogue" with Rednour and was unaware of any other WTFD figures having done so. Konzen Dep. 71.[33] Deputy Chief Scott never consulted with Rednour about possible accommodations when preparing his recommendation for termination; he received Dr. Moffatt's suggestion for an accommodation, but rejected it. Scott Dep. 224.[34] Scott expressed the opinion that accommodation for Rednour's condition was not possible. *Id.* at 139–140, 186–198, 208–209.[35]

---

[33] His testimony was as follows:
"Q: Did you ever engage in any interactive dialogue under the ADA or under anything with Kristine Rednour or any of her physicians on how to accommodate her?
[Konzen]: No, I did not.
Q: "Do you know of anybody under your command who did so prior to her termination or separation from service?
[Konzen]: No." Konzen Dep. 71.

[34] Defendants' reply brief does briefly mention the "accommodations" that Rednour put in place after the January 2011 episode, in the context of arguing that her failure to abide by them in June 2011 is evidence of her "failure to take responsibility and take action when her blood sugar is low." Defs.' Reply 12. Although this implicitly acknowledges that an accommodation existed after January 2011, Defendants never challenge Plaintiff's assertion that Rednour instituted these "accommodations" without any input from WTFD.

[35] Regardless of whether the changes volunteered by Rednour and accepted by Morgan in January 2011 were "accommodations," participation in the interactive process is a "continuing

Rather than claiming they ever participated in an accommodation process, Defendants instead argue that their duty to do so was never triggered because Rednour never expressly requested an accommodation. Defs.' Br. 24; Defs.' Reply 5–6. In support of their position, Defendants point to *Cloe v. City of Indianapolis,* 712 F.3d 1171, 1179 (7th Cir. 2013), in which the Seventh Circuit observed that "an employee generally has an initial duty to tell her employer that she needs an accommodation." 712 F.3d at 1179.

Defendants' quotation from *Cloe* does not accurately capture the essence of Seventh Circuit case law on the subject. The parties in *Cloe* disputed not the employer's duty to engage in the accommodation process *at all,* but whether the employer had a duty to provide a *particular* accommodation—in that case, proofreading help for an employee with multiple sclerosis. *See* 712 F.3d at 1179. Elsewhere in its decision, the Seventh Circuit stated the proposition slightly differently:

> Absent special circumstances, like a severe cognitive disability or mental illness, the employee's initial duty requires that he or she "indicate to the employer that she *has a disability and desires an accommodation*[.]" Here, Cloe mentioned to her supervisors that she was having trouble walking in April, but she never specifically asked them for an accommodation until July 2, 2008.

*Id.* at 1178 (emphasis added).

As this more expansive reading of *Cloe* suggests, the key inquiry is whether the employer was placed on notice that the employee had a disability that needed accommodating, not necessarily whether that notice came about from an explicit accommodation request from the employee. *See Spurling,* 739 F.3d at 1060 (holding that the employer's duty to initiate the interactive process begins after the "employee has disclosed that she has a disability"). *See also*

---

obligation" rather than a "one-off" event. *Cloe,* 712 F.3d at 1178; *see also Dunlap v. Liberty Natural Prods.*, 2013 Dist. LEXIS 167165, at *17–18. The fact that Morgan, as Plaintiff's immediate supervisor, signed off on Plaintiff's proposed voluntary behavioral changes does not, therefore, discharge Defendants' responsibility under the ADA.

*Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 696–697 (7th Cir. 1998) (citing *Beck,* 75 F.3d at 1134); *Shell v. Smith,* 2014 WL 3895951, at *8 (S.D. Ind. Aug. 7, 2014) ("The ADA requires an employer to engage in an interactive process once it is aware of the employee's disability.").

Plaintiff has designated ample evidence that she disclosed her diabetes to WTFD well before the June 2011 incident that instigated the termination process. According to Rednour, she revealed that she had type 1 diabetes during her initial interview for a paramedic position with the Department in December 2008. Rednour Aff. ¶ 1.[36] Dr. Moffatt, who performed Rednour's initial fitness for duty evaluation, was aware of her diabetes, which is reflected in his written report of the examination. Moffatt Dep. 26–28, 47–48. Rednour and Barry reported the January 2011 low blood sugar incident to Felicity Morgan, their firehouse supervisor. Morgan Dep, 48; Rednour Dep. 112, 116. Scott himself stated that he did not learn about prior incidents— including the January 2011 incident—until conducting his investigation after the June 22 incident. Scott Dep. 229–230. Regardless of when precisely he learned of Rednour's condition, there is no doubt that he and Konzen were aware of it when they resolved to terminate her; WTFD's termination letter explicitly cites the effects of her diabetes as the proximate cause of their decision. Konzen Dep. 71; Pl.'s Ex. 15. While it may be true that Rednour never expressly requested an accommodation after the June 2011 incident, *see* Rednour Dep. 106, WTFD was abundantly aware of the disability and the fact that its own consulting physician had recommended an accommodation for it.[37]

---

[36] Although Fire Chief Konzen states that he did not know about Rednour's diabetes personally until June or July 2011, he did not dispute that lower-level WTFD figures responsible for her hiring did know. "I'm sure her records showed that and that when she was hired they knew that." Konzen Dep. 77.

[37] It also appears from Konzen's testimony that, in contravention of preferred practice, Rednour was not invited during Scott's investigation to submit a written statement explaining herself and requesting to be retained or afforded an accommodation. Konzen Dep. 40–42. Although Scott

In its decision this year in *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055 (7th Cir. 2014), the Seventh Circuit examined the ADA "failure to accommodate" claim of an employee with narcolepsy who had been terminated despite her doctor's recommendation of an accommodation. 739 F.3d at 1061. The court summarized its reasoning as follows:

> Rather than collaborate with Spurling or her doctor to find a reasonable accommodation, C & M chose to turn a blind eye and terminate her. It did not seek further clarification from either Spurling or her doctor and disregarded the medical evaluation altogether. This is hardly engaging with Spurling to determine if a reasonable accommodation could be made. . . . The evidence suggests that a reasonable accommodation was readily available; Spurling simply needed further medical testing and a prescription to control her narcolepsy.

*Id.* at 1061–1062 (citing *Bultemeyer*, 100 F.3d at 1286). *See also Rehling,* 207 F.3d at 1016 (approving the denial of summary judgment where "there was an issue as to whether the employer engaged in an appropriate interactive process"). WTFD has conducted itself similarly here. Defendants appear to have concluded that Rednour was not qualified for an accommodation, or that no accommodation was possible—a position they are certainly entitled to take, although the evidence does not warrant summary judgment in their favor on the question. Defendants can hardly deny, however, that the issue of accommodations for Rednour's diabetes was on the table.

## Conclusion

For the reasons stated above, we resolve the two pending motions as follows:

---

and Konzen were aware of Rednour's diabetic status, some chance to communicate with them might have afforded her an opportunity to state the obvious: that she would prefer to be accommodated in her diabetes rather than fired. *See Miller v. Ill. Dep't of Corrections,* 107 F.3d 483, 486–87 (7th Cir. 1997) (noting that, in the context of job reassignment as an accommodation, the duty to engage in dialogue can be triggered merely by a plaintiff saying, "I want to keep working for you – do you have any suggestions?").

(1) Plaintiff's motion for leave to file surreply [Docket No. 91] is GRANTED in part and DENIED in part. As discussed above, the motion is granted with respect to the following sections of the attached surreply brief [Docket No. 91, Ex. C]: Section II.C.1, Section II.D, Section II.F.1, and Section II.G. The motion is denied with respect to the other portions of the attached brief, which deal with issues outside the scope of surreplies as permitted by Local Rule 56-1(d).

(2) Defendants' motion for leave to file sur-surreply [Docket No. 99] is GRANTED.

(3) Defendants' motion for summary judgment [Docket No. 38] is DENIED.

     IT IS SO ORDERED.

Date: _____9/24/2014_____

_Sarah Evans Barker_ (signature)

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Courtney E. Campbell
BETZ & BLEVINS
ccampbell@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Christine L. Zook
FERGUSON & FERGUSON
clz@ferglaw.com

Megan J. Schueler
FERGUSON & FERGUSON
mjs@ferglaw.com